## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

          *Plaintiff*,

v.

NORFOLK SOUTHERN CORPORATION,
NORFOLK SOUTHERN RAILWAY
COMPANY,

          *Defendants.*

No. 1:24-cv-2226-ABJ

**Oral Argument Requested**

## NORFOLK SOUTHERN'S BRIEF IN SUPPORT
## OF ITS MOTION TO TRANSFER OR DISMISS

Kristin Graham Koehler (D.C. Bar No. 464422)
Gordon D. Todd (D.C. Bar No. 475203)
Raymond A. Atkins (D.C. Bar No. 461476)
Tobias S. Loss-Eaton (D.C. Bar No. 1019749)
Stephen S. Laudone (D.C. Bar No. 1708325)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
kkoehler@sidley.com

*Counsel for Norfolk Southern Corporation
and Norfolk Southern Railway Company*

## CONTENTS

Table of authorities ...................................................................................................... ii

Introduction .................................................................................................................. 1

Background ................................................................................................................... 3

    A.    Legal background ........................................................................................ 3

    B.    The complaint's allegations. ...................................................................... 5

Legal standards ............................................................................................................ 7

Argument ...................................................................................................................... 8

I.    The Court should dismiss this case or transfer it to the Northern District of
Georgia because this is the wrong forum. ............................................................ 8

    A.    Personal jurisdiction is lacking and venue is improper. ........................... 8

    B.    A discretionary transfer is in the interests of justice. .............................. 11

II.    The Court should dismiss the complaint for failure to state a claim. ................... 14

    A.    The Government's complaint depends on an absolutist, "presidential
motorcade" theory of preference. ............................................................. 15

    B.    The Government's extreme theory is wrong. ........................................... 17

        1.    Statutory text, structure, and context show that Congress did not
mandate absolute priority for Amtrak trains. ............................... 18

        2.    Regulatory and legislative history confirm that "preference" has
never meant absolute priority for passenger trains. .................... 24

        3.    The Government's theory would upend the rail network and
Amtrak's finances. ...................................................................... 27

Conclusion .................................................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**

*Accurso v. Fed. Bureau of Prisons*,
   No. 17-cv-02626 (APM), 2018 WL 4964501 (D.D.C. Oct. 15, 2018) ................................... 14

*AF Holdings, LLC v. Does 1–1058*,
   752 F.3d 990 (D.C. Cir. 2014) ................................................................................................ 10

*Alakhfash v. Jaddou*,
   No. 23-cv-3458 (ABJ), 2024 WL 5044926 (D.D.C. Sept. 23, 2024) ..................................... 12

*Alaska Chapter, Associated Gen. Contractors of Am., Inc. v. Pierce*,
   694 F.2d 1162 (9th Cir. 1982) ................................................................................................ 19

*AMG Cap. Mgmt., LLC v. FTC*,
   593 U.S. 67 (2021) .................................................................................................................. 24

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................... 7, 15, 17

*\*Beall v. Edwards Lifesciences LLC*,
   310 F. Supp. 3d 97 (D.D.C. 2018) ........................................................................ 11, 12, 13, 14

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal., S.F. Cnty.*,
   582 U.S. 255 (2017) .................................................................................................................. 9

*Bryant v. Taylor*,
   244 F. Supp. 3d 209 (D.D.C. 2017) ....................................................................................... 17

*Cockrum v. Donald J. Trump for President, Inc.*,
   319 F. Supp. 3d 158 (D.D.C. 2018) .......................................................................................... 7

*Crane v. N.Y. Zoological Soc'y*,
   894 F.2d 454 (D.C. Cir. 1990) .................................................................................................. 7

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014) .................................................................................................................. 8

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
   592 U.S. 351 (2021) ........................................................................................................ 8, 9, 10

*FTC v. HCA Healthcare, Inc.*,
   No. CV 23-1103 (ABJ), 2023 WL 11872582 (D.D.C. May 23, 2023) .............................. 13, 14

*GTE New Media Servs. Inc. v. BellSouth Corp.*,
   199 F.3d 1343 (D.C. Cir. 2000) ............................................................................................... 8

*Maracich v. Spears*,
   570 U.S. 48 (2013) .................................................................................................................. 29

*Maysaroh v. Am. Arab Commc'ns & Translation Ctr., LLC*,
   51 F. Supp. 3d 88 (D.D.C. 2014) ................................................................................ 11, 12, 14

*Mich. Welfare Rts. Org. v. Trump*,
　600 F. Supp. 3d 85 (D.D.C. 2022) ......................................................................7

*Mouzavires v. Baxter*,
　434 A.2d 988 (D.C. 1981) (en banc) .................................................................10

*Noble v. Nat'l Ass'n of Letter Carriers*,
　103 F.4th 45 (D.C. Cir. 2024) ...........................................................................18

*Ross v. United States*,
　No. 86-0857, 1987 WL 33514 (D.D.C. Dec. 30, 1987) .....................................13

*S. Pac. Co. v. State of Ariz. ex rel. Sullivan*,
　325 U.S. 761 (1945) ..........................................................................................24

*Sabre Int'l Sec. v. Torres Advanced Enter. Sols., LLC*,
　60 F. Supp. 3d 21 (D.D.C. 2014) .........................................................................8

*Scott v. J.P. Morgan Chase & Co.*,
　296 F. Supp. 3d 98 (D.D.C. 2017) .....................................................................20

*In re Sealed Case*,
　932 F.3d 915 (D.C. Cir. 2019) .............................................................................8

*Simmons v. ICC*,
　697 F.2d 326 (D.C. Cir. 1982) ...........................................................................23

*United States v. S. Pac. Transp.*,
　No. 79-3394 (D.D.C.) ..........................................................................................4

*United Therapeutics Corp. v. Vanderbilt Univ.*,
　278 F. Supp. 3d 407 (D.D.C. 2017) .....................................................................9

*Walden v. Fiore*,
　571 U.S. 277 (2014) ............................................................................................9

*Yates v. United States*,
　574 U.S. 528 (2015) ..............................................................................18, 19, 22

**Statutes and Rules**

28 U.S.C. § 1391(c)(2) ............................................................................................10

　　§ 1404(a) .........................................................................................8, 11, 12, 30

　　§ 1406(a) .................................................................................................8, 10, 30

　　§ 1631 .....................................................................................................8, 10, 30

49 U.S.C. § 10101 ...................................................................................................22

　　§ 11101(a) ...................................................................................................22

　　§ 21103 .......................................................................................................13

　　§ 24103(a) ...............................................................................................4, 10

　　§ 24103(d) ....................................................................................................10

§ 24301(a) ...................................................................................................................3

*§ 24308(a) .............................................................................................................3, 23

*§ 24308(a)(1) ......................................................................................................19, 20

§ 24308(a)(2)(B) ..............................................................................................2, 20, 28

*§ 24308(c) ........................................................................................................ *passim*

§ 24308(f) ....................................................................................................................5

Amtrak Improvement Act of 1973,
    Pub. L. No. 93-146, § 10(2), 87 Stat. 548 ............................................................4

Rail Passenger Service Act of 1970,
    Pub. L. No. 91-518, § 301, 84 Stat. 1327, 1330 .............................................3, 23

Staggers Rail Act of 1980,
    Pub. L. No. 96-448, § 3(1), 94 Stat. 1895, 1897 ................................................23

D.C. Code § 13-423(a)(1) ................................................................................................10

Fed. R. Civ. P. 4(k)(1) ...................................................................................................8

Fed. R. Civ. P. 12 ........................................................................................................20

Fed. R. Civ. P. 12(b)(2) .........................................................................................7, 8, 30

Fed. R. Civ. P. 12(b)(3) .........................................................................................7, 8, 30

Fed. R. Civ. P. 12(b)(6) .......................................................................................7, 17, 30

## Administrative Materials

Amtrak's Opening Statement, *Compl. and Pet. of the Nat'l R.R. Passenger Corp.
under 49 U.S.C. § 24308(f),*
    S.T.B. Docket No. NOR 42175 (filed Oct. 8, 2024), https://shorturl.at/1V5Zu ...............16, 17

*Application of the Nat'l R.R. Passenger Corp. Under 49 U.S.C. 24308(a)—Union
Pac. R.R. & S. Pac. Transp. Co.,*
    3 S.T.B. 143 (1998) ..........................................................................................28

Hearing, *Buckingham Branch R.R.—Lease—CSX Transp., Inc.,*
    S.T.B. Docket No. FD 34495 (Oct. 13, 2004) ........................................................26

*Comments of the Nat'l R.R. Passenger Corp.,*
    S.T.B. Docket No. EP 728 (filed Feb. 22, 2016), https://shorturl.at/LIgg1 ............................27

*Implementing Intercity Passenger Train On-Time Performance and Preference
Provisions of 49 U.S.C. § 24308(c) and (f),*
    Docket No. EP 728 (S.T.B. served Dec. 28, 2015), https://shorturl.at/nfqZr ....................3, 26

*Norfolk S. Ry.—Pet. for Decl. Ord.—Interchange with Reading Blue Mt. & N. R.R.,*
    Docket No. NOR 42078, 2003 WL 1963547 (S.T.B. served Apr. 29, 2003) ..........................22

*Penn Cent. Transp.—Discontinuance of 34 Passenger Trains,*
    338 I.C.C. 380 (1970) .........................................................................................25

*R.R. Passenger Train Deficit*,
  306 I.C.C. 417 (1959) .......................................................................................23

*S. Pac. Co.—Discontinuance of Trains*,
  330 I.C.C. 685 (1967) .......................................................................................24

Admin. Office of U.S. Courts, *Table C—U.S. District Courts—Civil Federal
  Judicial Caseload Statistics* (March 31, 2024), https://shorturl.at/QIGOV ............................14

U.S. Dep't of Transp. Inspector General, *Root Causes of Amtrak Train Delays*,
  No. CR-2008-076 (Sept. 8, 2008), https://shorturl.at/YXwU6 ................................................27

## Legislative Material

*Dep't of Transp. and Related Agencies Appropriations for 1982: Hearings Before
  a Subcomm. of the H. Comm. of Appropriations*, 97th Cong. 483 (1981) ............................26

*Dep't of Transp. and Related Agencies Appropriations for Fiscal Year 1977:
  Hearings Before Subcomm. of the S. Comm. on Appropriations*, 94th Cong.
  547 (1976) .........................................................................................................25

*Financial Assistance to Amtrak: Hearings Before the Subcomm. on Transp. and
  Aeronautics*, 93d Cong. 32 (1973) ...............................................................2, 25

H.R. Rep. No. 91-1580 (1970), 1970 U.S.C.C.A.N. 4735 .........................................20, 23

H.R. Rep. No. 104-311 (1995), 1995 U.S.C.C.A.N. 793 ...............................................23

## Other Authorities

Assoc. of Am. R.R., *Chronology of America's Freight Railroads* (Aug. 2024) ............................23

*American Heritage Dictionary* 556 (1970) ..........................................................18

*Random House Dictionary* 1134 (1973) ................................................................18

*Scholastic Dictionary of American English* (1971) ................................................18

*Authorities on which we chiefly rely are marked with an asterisk.*

## INTRODUCTION

In most of the country, the National Railroad Passenger Corporation's (Amtrak's) passenger trains operate on rail lines owned and operated by common-carrier freight railroads. This arrangement dates to 1970, when Congress transferred the duty to provide passenger service from the existing private railroads to the newly created Amtrak. Amtrak has contracts with its host railroads that govern service, schedules, and compensation. And since 1973, Congress has mandated that Amtrak trains generally have "preference over freight transportation in using a rail line, junction, or crossing." 49 U.S.C. § 24308(c).

In this case, the Government claims Norfolk Southern Railway Company "regularly fail[s] to provide" this statutory "preference" to Amtrak's trains traveling between New York City and New Orleans, known as the Crescent route. Compl. ¶ 2. But this suit has two fundamental flaws.

*First*, the Government has sued in the wrong place. This case is about Norfolk Southern's dispatching policies and practices—issued and handled from its Atlanta, Georgia headquarters—regarding its rail line running from Virginia to Louisiana. Norfolk Southern does not own or dispatch any rail lines in the District of Columbia, and the complaint alleges no conduct by Norfolk Southern in this forum or purposely directed to it. That delayed Crescent trains might arrive late at Union Station—on tracks not owned by Norfolk Southern—does not mean the case arises here or that minimum contacts exist. Thus, this Court lacks personal jurisdiction and venue is improper.

For the same reasons, a discretionary transfer to the Northern District of Georgia is warranted. The most important transfer factors—where the claim arose, the convenience of witnesses and access to sources of proof, and the strong public interest in deciding local controversies at home—all favor sending this case to Atlanta.

*Second*, forum aside, the complaint fails to state a claim. The complaint assumes that "preference" is violated whenever a host railroad takes "actions that result[ ] in delays to Amtrak

trains that [c]ould have been avoided," regardless of the reasons for those actions or the consequences for other rail traffic. *See* Compl. ¶ 26. In other words, the complaint depends on the idea that freight railroads must totally clear their tracks for approaching Amtrak trains, the same way D.C.-area commuters must clear the road for the President's motorcade—even if the result is a massive traffic jam.

But "preference" for passenger trains has *never* worked that way. Not in the decades before Congress codified it, and not in the half-century since. And with good reason: If adopted, the Government's absolutist theory would produce gridlock, with a series of cascading delays grinding the rail network to a halt. Congress thus recognized that dispatchers must have flexibility to ensure the smooth flow of *all* traffic, not just individual passenger trains. As Amtrak's own president testified in the run-up to the "preference" statute's enactment: "[T]o try to legislate that and say, 'You will always give preference to the passenger train, or never let a freight train interfere,' just is not a real-world approach." *Financial Assistance to Amtrak: Hearings before the Subcomm. on Transp. and Aeronautics*, 93d Cong. 32 (1973). It is thus unsurprising that every interpretive tool—including statutory text, structure, history, and purpose—rebuts the Government's extreme reading of "preference."

For that matter, if Amtrak were really entitled to presidential-motorcade service, it would have to *pay* the host railroads' "incremental costs" of providing that level of service, 49 U.S.C. § 24308(a)(2)(B)—which it almost certainly cannot do. So the government's theory would likely result in a massive bill to U.S. taxpayers.

The Court should dismiss this case or transfer it to the Northern District of Georgia.

## BACKGROUND

### A.    Legal background.

The statutory regime governing Amtrak's relationships with freight railroads dates to 1970. Before then, private railroads owned the nation's rail lines and operated both freight and passenger service.  Amtrak did not exist; it was created as a federally chartered corporation through the Rail Passenger Service Act of 1970, which Congress passed in response to a crisis in the rail industry (described in more detail below).  *See* Pub. L. No. 91-518, § 301, 84 Stat. 1327, 1330; 49 U.S.C. § 24301(a); *infra* p. 23.  This law transferred the duty to provide passenger service from the existing railroads to the newly created Amtrak.  And since the existing railroads still owned and operated most rail lines, the law directed Amtrak to negotiate agreements with them to operate passenger service over their lines.  *Id.* §§ 401–402, 84 Stat. at 1334–35.  This directive is now codified in a subsection of the statute the Government invokes here.  *See* 49 U.S.C. § 24308(a).

Consistent with this directive, "Amtrak has executed operating agreements with Norfolk Southern and numerous other 'host' railroads that own and maintain rail lines, which govern compensation and other terms of this arrangement."  Compl. ¶ 4.  In turn, "most of Amtrak's passenger service is provided over rail lines that are owned by other host carriers, mainly Class I freight railroads," *i.e.*, the nation's largest freight railroads, including Norfolk Southern.  *See* Policy Statement at 2, *Implementing Intercity Passenger Train On-Time Performance and Preference Provisions of 49 U.S.C. § 24308(c) and (f)*, Docket No. EP 728 (S.T.B. served Dec. 28, 2015) (*Proposed Policy Statement*), https://shorturl.at/nfqZr.  "Those host carriers are responsible for dispatching both freight and passenger trains on their lines. On these lines, Amtrak trains share tracks and facilities with freight trains and, in a number of major metropolitan areas, a substantial volume of commuter rail service."  *Id.*

The 1970 statute did not contain a "preference" provision. That was added three years later, in the Amtrak Improvement Act of 1973. *See* Pub. L. No. 93-146, § 10(2), 87 Stat. 548. This provision is codified today in substantially the same form, though it was originally administered by the Secretary of Transportation and now is administered by the Surface Transportation Board (which in 1995 replaced the defunct Interstate Commerce Commission as the rail industry's main economic regulator). The statute provides: "Except in an emergency, intercity and commuter rail passenger transportation provided by or for Amtrak has preference over freight transportation in using a rail line, junction, or crossing unless the Board orders otherwise under this subsection." 49 U.S.C. § 24308(c).

The "preference" statute also allows a "rail carrier affected by this subsection" to "apply to the Board for relief" from the "preference" obligation: If the Board finds, after a hearing, "that preference for [Amtrak trains] materially will lessen the quality of freight transportation provided to shippers, the Board shall establish the rights of the carrier and Amtrak on reasonable terms." *Id.* As the complaint notes, "[n]o host railroad has ever sought, let alone been granted, such relief from" the Board. Compl. ¶ 13.

The "preference" statute has two enforcement mechanisms. First, the Department of Justice may—as it has done here—"bring a civil action for equitable relief . . . when Amtrak or a rail carrier . . . engages in or adheres to an action, practice, or policy inconsistent with" certain statutory provisions, including § 24308. *See* 49 U.S.C. § 24103(a); Compl. ¶¶ 1, 4, 7. The Government has sued a host railroad under § 24103(a) to enforce "preference" just once before: In 1979, the Government sued Southern Pacific Transportation over its treatment of a particular Amtrak service (the Sunset Limited, between New Orleans and Los Angeles). *See United States*

*v. S. Pac. Transp.*, No. 79-3394 (D.D.C.). That case was resolved without a final decision, so there are no court decisions interpreting "preference."

Second, under a 2008 statutory amendment, the Surface Transportation Board can investigate "delays or failures" by Amtrak trains "to achieve [certain] minimum standards," including whether those delays "are attributable to a rail carrier's failure to provide preference to Amtrak over freight transportation." *See* 49 U.S.C. § 24308(f). This second mechanism is relevant here only because the Board is currently investigating whether certain railroads other than Norfolk Southern have provided "preference" to Amtrak trains on a different route (the Sunset Limited again). *See Compl. & Pet. of the Nat'l R.R. Passenger Corp. under 49 U.S.C. § 24308(f)—for Substandard Performance of Amtrak's Sunset Ltd. Trains 1 & 2*, Docket No. NOR 42175, 2024 WL 3877442, at \*1 (S.T.B. served Aug. 19, 2024). While there is no factual overlap between that proceeding and this case, Amtrak's legal position there mirrors the Government's theory here, so it is discussed below.

### B. The complaint's allegations.

The complaint's sole count alleges that Norfolk Southern "regularly fail[s] to provide [Amtrak] passenger trains with their statutory right to preference over freight transportation on Amtrak's Crescent service, which provides daily passenger rail service in each direction between New York, New York, and New Orleans, Louisiana." Compl. ¶ 2; *see id.* ¶¶ 41–43.

"Amtrak runs two passenger trains along the Crescent Route each day—one northbound train and one southbound train." *Id.* ¶ 19. "Norfolk Southern owns or controls the dispatching of more than 1,140 miles of the 1,377 mile Crescent Route," between New Orleans and Alexandria, Virginia. *Id.* ¶ 20. "The Crescent Route contains a mix of single and double main line track." *Id.* ¶ 31. "The majority of main line track south of Atlanta"—on Norfolk Southern's portion of the

route—"is single-line track with interspersed sidings off the mainline that allow trains to pull over to allow a faster train to pass, or to allow a train traveling in the opposite direction to pass." *Id.*

"Amtrak owns or leases and operates most of the remaining track" on the Crescent route, "comprised primarily of the Northeast Corridor between New York, New York, and Washington, D.C." *Id.* ¶ 20. Non-party CSX Transportation owns and operates the 7.9-mile segment between the northern end of Norfolk Southern's line in Alexandria and the start of Amtrak's segment in the District of Columbia. *Id.* Thus, Norfolk Southern neither owns the rails nor dispatches the Crescent route segments that pass through the District or reach its borders.

The complaint alleges that "passengers on Norfolk Southern's portion of the Crescent Route repeatedly arrive late at their designated stations." *Id.* ¶ 25. "Freight train interference," the complaint says, "is by far the leading cause of delay for Crescent Route trains. Freight train interference delays occur when an Amtrak train is stopped or slowed because of a freight train." *Id.* ¶ 28. The complaint asserts that the "vast majority of freight train interference delays result from preference violations." *Id.*; *accord id.* ¶ 31.

The complaint identifies five types of actions that have allegedly "resulted in delays to Amtrak trains that would have been avoided if those passenger trains had been given preference": "(i) requiring Amtrak trains to pull into a siding and stop to allow a freight train to pass; (ii) requiring Amtrak trains to follow behind slower freight trains; (iii) running freight trains that are longer than available sidings, thereby preventing freight trains from allowing passenger trains to pass and requiring Amtrak trains to follow behind the slower freight trains; (iv) blocking Amtrak trains from serving passenger stations; and (v) recrewing freight trains on the main line while blocking Amtrak trains." *Id.* ¶ 26. The complaint alleges at least one specific example of each action from 2022–2024. *See id.* ¶¶ 33–37.

The complaint does not, however, describe the surrounding circumstances or the reasons for any of these specific dispatching decisions. It also alleges nothing about the content or requirements of Norfolk Southern's dispatching policies, supervisory functions, or training programs. And while the complaint acknowledges that "Amtrak has executed operating agreements with Norfolk Southern" and other host carriers, it says nothing about the terms of the Amtrak–Norfolk Southern contract that governs the Crescent service. *See id.* ¶ 12.

The complaint alleges that "[v]enue is proper in this District . . . because Amtrak"—a non-party—"maintains its headquarters and principal place of business in Washington, D.C." *Id.* ¶ 8. It also acknowledges that each defendant "is a Virginia corporation with its principal place of business in Atlanta, Georgia." *Id.* ¶¶ 5, 6. And it asserts no basis for personal jurisdiction.

## LEGAL STANDARDS

If a defendant moves to dismiss for lack of personal jurisdiction under Rule 12(b)(2), the plaintiff "has the burden of establishing a factual basis for the exercise of personal jurisdiction over the defendant." *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990). "To meet this burden, the plaintiff must allege specific facts that connect each defendant with the forum." *Mich. Welfare Rts. Org. v. Trump*, 600 F. Supp. 3d 85, 97 (D.D.C. 2022). Likewise, in assessing a Rule 12(b)(3) motion asserting improper venue, the court accepts as true any "well-pled factual allegations regarding venue," but the "plaintiff has the burden of demonstrating that venue is proper." *Cockrum v. Donald J. Trump for President, Inc.*, 319 F. Supp. 3d 158, 173 (D.D.C. 2018) (cleaned up).

To avoid dismissal under Rule 12(b)(6), a complaint must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is "plausible" if its "well-pleaded factual allegations" support "the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678–79.

**ARGUMENT**

I.    **The Court should dismiss this case or transfer it to the Northern District of Georgia because this is the wrong forum.**

This case does not belong in this Court. Personal jurisdiction is lacking and venue is improper, requiring dismissal or transfer under Rule 12(b)(2)–(3) and 28 U.S.C. §§ 1406(a), 1631. And even if that were not so, the case's center of gravity is Atlanta, so a discretionary transfer to the Northern District of Georgia under § 1404(a) is proper.

    A.    **Personal jurisdiction is lacking and venue is improper.**

1.    Unless a federal statute creates an exception, a district court's exercise of personal jurisdiction is limited by the Fourteenth Amendment's Due Process Clause and the forum's long-arm statute. *In re Sealed Case*, 932 F.3d 915, 924 (D.C. Cir. 2019); *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000); Fed. R. Civ. P. 4(k)(1). Thus, personal jurisdiction here requires contacts between Norfolk Southern and the District of Columbia that can support either general, "all-purpose" jurisdiction or specific, "conduct-linked" jurisdiction. *Daimler AG v. Bauman*, 571 U.S. 117, 122, 126–27 (2014). The complaint must "allege specific facts on which personal jurisdiction can be based." *Sabre Int'l Sec. v. Torres Advanced Enter. Sols., LLC*, 60 F. Supp. 3d 21, 27 (D.D.C. 2014) (cleaned up).

General jurisdiction is plainly lacking. The complaint does not allege that Norfolk Southern Railway or its parent company—each "a Virginia corporation with its principal place of business in Atlanta, Georgia," Compl. ¶¶ 5–6—is "at home" in the District of Columbia. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021). So this suit would require specific jurisdiction, meaning the claims "must arise out of or relate to" Norfolk Southern's purposeful minimum contacts with the District. *See id.*

That standard is not met.  The complaint suggests just two links between this suit and the District of Columbia.  First, the Crescent service passes through the District while traveling between New York and New Orleans, stopping at Union Station.  Compl. ¶¶ 14, 30.  But as the complaint notes, Norfolk Southern does not own or operate this part of the route.  Amtrak owns the Crescent route north of Union Station (the Northeast Corridor), *id.* ¶ 14, and non-party CSX owns and operates the segment between Union Station and Alexandria, where Norfolk Southern's tracks begin, *id.* ¶ 20.  So Norfolk Southern does not dispatch Crescent trains in the District, or even as they reach its borders.  *See id.* ¶ 14.  That Crescent trains pass through the District after they leave Norfolk Southern's portion of the line is a far cry from Norfolk Southern "purposefully avail[ing] itself of the privilege of conducting activities within the forum."  *See Ford*, 592 U.S. at 359; *Walden v. Fiore*, 571 U.S. 277, 290 (2014) ("The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way.").

Second, the complaint suggests in passing that Norfolk Southern "operates" other "rail track" in the District.  Compl. ¶ 6.  But the Government's claims do not arise out of or relate to any non-Crescent operations in the District, and "a corporation's continuous activity of some sorts within a [forum] is not enough to support the demand that the corporation be amenable to suits unrelated to that activity."  *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 264 (2017) (cleaned up).  In any event, this allegation is inaccurate.  Norfolk Southern neither owns nor dispatches any track in the District; it merely has trackage rights to send its trains over CSX's D.C. lines.  *See* McClellan Decl. ¶¶ 2–3; *see United Therapeutics Corp. v. Vanderbilt Univ.*, 278 F. Supp. 3d 407, 411 (D.D.C. 2017) (a court can consider extra-pleading material on a motion to dismiss for lack of personal jurisdiction).

The complaint thus fails to establish specific jurisdiction.  And for the same reasons, it does not show "any transaction of business in the District of Columbia that can be reached jurisdictionally without offending the due process clause," as the District's long-arm statute requires.  *See Mouzavires v. Baxter*, 434 A.2d 988, 993 (D.C. 1981) (en banc); D.C. Code § 13-423(a)(1).  Personal jurisdiction is thus lacking.

2.    The same analysis governs venue.  Under the statute authorizing this suit, "a civil action … may be brought in the judicial district in which Amtrak or the rail carrier resides or is found." 49 U.S.C. § 24103(d).  Though the Government assumes this means it can sue a rail carrier where *Amtrak* is found, *see* Compl. ¶ 8, that is wrong.  The statute lets the Government sue either "Amtrak or a rail carrier" for violating or obstructing various statutory provisions, not just the "preference" provision.  *See* 49 U.S.C. § 24103(a).  In this context, the venue language—addressed to "Amtrak or *the* rail carrier"—is naturally read to refer to whichever party is the defendant.  *Id.* § 24103(c) (emphasis added).  It would make little sense for Congress to authorize suing one party wherever a different non-party happens to be found.  Thus, what matters for venue is whether *Norfolk Southern* "resides or is found" in the District of Columbia.  And for corporate defendants, the phrase "resides or is found" refers to forums where personal jurisdiction exists.  *See* 28 U.S.C. § 1391(c)(2); *AF Holdings, LLC v. Does 1–1058*, 752 F.3d 990, 996 (D.C. Cir. 2014).  So, in this case, venue and personal jurisdiction merge.

*        *        *

Because personal jurisdiction is lacking and venue is improper, the Court should dismiss this case or transfer it to the Northern District of Georgia.  *See* Fed. R. Civ. P. 12(b)(2)–(3); 28 U.S.C. §§ 1406(a), 1631 (allowing transfers to cure improper venue and lack of jurisdiction, respectively).  This suit could have been brought in the Northern District because Norfolk Southern

is headquartered in Atlanta, Compl. ¶¶ 5–6, so it is subject to personal jurisdiction there, *see Ford*, 592 U.S. at 359, and "is found" there under § 24103(c).

**B.    A discretionary transfer is in the interests of justice.**

Alternatively, a discretionary transfer to the Northern District of Georgia is warranted. "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  28 U.S.C. § 1404(a).  As just noted, this case could have been brought in the Northern District.

In considering a transfer under § 1404(a), courts weigh "several private-interest factors," including: "(1) the plaintiff's choice of forum, unless the balance of convenience is strongly in favor of the defendant; (2) the defendant's choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) the ease of access to sources of proof."  *Beall v. Edwards Lifesciences LLC*, 310 F. Supp. 3d 97, 103 (D.D.C. 2018). Courts also consider "certain public-interest factors," including "(1) the transferee's familiarity with the governing laws, (2) the relative congestion of each court, and (3) the local interest in deciding local controversies at home."  *Id.*  Here, these factors decisively favor transfer.

***The parties' respective chosen forums.***  Normally, a plaintiff's choice of forum receives more weight than a defendant's.  *Beall*, 310 F. Supp. 3d at 104.  But the plaintiff's choice receives less deference if "most of the relevant events giving rise to her claims occurred elsewhere."  *Id.* (cleaned up).  *None* of the relevant events occurred in this District.  Norfolk Southern's dispatching policies and decisions are made in Atlanta, *see* McClellan Decl. ¶ 4; Norfolk Southern's portion of the Crescent route is entirely outside the District; and the specific events alleged in the complaint occurred in Georgia, Alabama, Mississippi, Louisiana, and South Carolina.  *See* Compl. ¶¶ 33–37; *see also Maysaroh v. Am. Arab Commc'ns & Translation Ctr., LLC*, 51 F. Supp. 3d 88, 96 (D.D.C.

2014) (first factor favored transfer, despite plaintiff's choice of forum, because "the majority of alleged events" happened elsewhere).

Likewise, the defendant's choice is entitled to more weight if the defendant "has a substantial connection to its chosen forum." *Beall*, 310 F. Supp. 3d at 104. Norfolk Southern has such a connection to the Northern District of Georgia because its "headquarters is located" there and "the allegedly [unlawful] policies were made there." *Id.*

**Whether the claim arose elsewhere.** Claims against corporations typically "arise" "where the corporate decisions underlying those claims were made or where most of the significant events giving rise to the claims occurred." *Beall*, 310 F. Supp. 3d at 104 (citing cases). Again, the relevant corporate policies and dispatching decisions were made in Atlanta, and the specific events alleged in the complaint occurred in Georgia and other states. "[C]ourts frequently grant transfer motions where the circumstances giving rise to the controversy occurred in the transferee forum." *Maysaroh*, 51 F. Supp. 3d at 96 (cleaned up); *e.g.*, *Alakhfash v. Jaddou*, No. 23-cv-3458 (ABJ), 2024 WL 5044926, at *3 (D.D.C. Sept. 23, 2024) (transferring case "more closely tied" to the other forum).

**The convenience of the parties and witnesses and access to sources of proof.** "The most critical factor to examine under 28 U.S.C. § 1404(a) is the convenience of the witnesses." *Beall*, 310 F. Supp. 3d at 105. As noted, the claims here target Norfolk Southern's alleged "actions, practices, or policies" involving and governing its dispatching of Crescent trains. *See* Compl. ¶ 41. And the witnesses who can be "expected to testify regarding these very policies and decisions," *Beall*, 310 F. Supp. 3d at 105, are Norfolk Southern officers and employees who work from and live near the company's Atlanta headquarters. That is where company policy is set, including for dispatching, and that is where individual dispatching decisions are made. "Indeed, courts have

consistently transferred actions when the majority of witnesses live near the transferee forum." *Id.* (cleaned up).  Likewise, documents bearing on these claims will be found overwhelmingly in Atlanta.  (Whether "the records may be in electronic form" is irrelevant, *id.* at 106.)

To be sure, if this case progresses, it may involve witnesses based at Amtrak's D.C. headquarters or documents located there.  But Amtrak corporate officials cannot speak directly to whether Norfolk Southern provides preference—a question of Norfolk Southern's dispatching policies and practices—or what happened in any of the specific situations alleged in the complaint. And any first-hand eye-witnesses to those specific alleged events would likely be Amtrak or Norfolk Southern train crews, who probably live closer to Atlanta than to this Court, given federal hours-of-service laws.  *See* 49 U.S.C. § 21103.  Thus, the location of potential witnesses other than Norfolk Southern's Atlanta-based officials and dispatchers is not significant.  *See Ross v. United States*, No. 86-0857, 1987 WL 33514, at *5 (D.D.C. Dec. 30, 1987) (granting transfer where potential D.C.-based witnesses would "testify on issues that are collateral to the central questions of the cases").[1]

***The transferee's familiarity with the governing laws, relative congestion, and deciding local controversies at home***.  Lastly, the public-interest factors favor transfer.  Legal familiarity is a wash, as "all federal courts are presumed to be equally familiar with the law governing statutory claims."  *Beall*, 310 F. Supp. 3d at 106.  But case familiarity does not weigh against transfer; "because the case is in its earliest stages, there would be no delay associated with the [Georgia] district court's having to familiarize itself with this case."  *Id.* (cleaned up).

---

[1] The respective locations of the parties themselves are not significant.  *See FTC v. HCA Healthcare, Inc.*, No. CV 23-1103 (ABJ), 2023 WL 11872582, at *10 (D.D.C. May 23, 2023) (government agency's D.C. presence was "not a compelling reason to deny transfer," but other party's location was "not a significant factor" because its attorneys were also D.C.-based).

Relative congestion is neutral.  In 2024, this District had slightly fewer pending civil cases per active District Judge than the Northern District.[2]  But those figures "do not tell the court much about the relative congestion and complexity of the districts' respective dockets."  *Accurso v. Fed. Bureau of Prisons*, No. 17-cv-02626 (APM), 2018 WL 4964501, at *3 (D.D.C. Oct. 15, 2018).  In particular, this Court has had to deal with the "significant influx of criminal cases and criminal trials in this district beginning in 2021."  *FTC*, 2023 WL 11872582, at *12.

Finally, "the third and arguably most important public interest factor," *FTC*, 2023 WL 11872582, at *12 (cleaned up), turns on "where a clear majority of the operative events took place," *Beall*, 310 F. Supp. 3d at 106; *Maysaroh*, 51 F. Supp. 3d at 97.  Again, none of the operative events took place in the District of Columbia, and all of them occurred at least in part Georgia.

Transfer under § 1404 is thus warranted.  If the Court grants this request, then the questions of personal jurisdiction and venue are moot.  *See FTC*, 2023 WL 11872582, at *1.

## II.    The Court should dismiss the complaint for failure to state a claim.

If this Court reaches the merits, it should dismiss the case.  The Government's complaint depends on the assumption that (absent an emergency, which the Government does not define) a host railroad violates "preference" under 49 U.S.C. § 24308(c) whenever it takes any action that delays an Amtrak train—regardless of why it acted or the consequences of not acting for other rail traffic.  This extreme view of "preference" contradicts every interpretive tool, including decades of history.  If adopted, it would wreak havoc on the rail network and Amtrak's finances.  The Court should reject it.

---

[2] This District had 5,072 civil cases pending in mid-2024, an 11.5% increase from 2023, equaling 362 cases per active District Judge.  The Northern District had had 4,368 civil cases pending, an 18.1% decrease, equaling 397 cases per active District Judge.  *See* Admin. Office of U.S. Courts, *Table C—U.S. District Courts—Civil Federal Judicial Caseload Statistics* (March 31, 2024), https://shorturl.at/QIGOV.

### A.    The Government's complaint depends on an absolutist, "presidential motorcade" theory of preference.

The complaint alleges that Norfolk Southern has "fail[ed] to provide preference to the two daily Amtrak intercity passenger trains on the Crescent Route" because it "has taken actions that resulted in delays to Amtrak trains that would have been avoided if those passenger trains had been given preference." Compl. ¶ 26.  In particular, the complaint says "the leading cause of delay for Crescent Route trains" is "freight train interference," which "occur[s] when an Amtrak train is stopped or slowed because of a freight train." *Id.* ¶ 28.  These alleged violations fall into various categories, like "requiring Amtrak trains to pull into a siding and stop to allow a freight train to pass." *Id.* ¶ 26; s*ee id.* ¶¶ 33–37.

The complaint is silent, however, on the *reasons* for these dispatching decisions or the processes behind them.  For example, the complaint alleges four situations when Amtrak trains met freight trains traveling in the opposite direction along a single-track stretch of the Crescent route; each time, Norfolk Southern's dispatchers "directed [the Amtrak] train into a siding to allow Norfolk Southern freight trains . . . to pass." *Id.* ¶ 33; *see id.* ¶ 31.  But the complaint says nothing about the circumstances in which these decisions were made.  It does not address any prior delays to any of the trains involved, any accidents, mechanical issues, or weather events in the surrounding area, any physical or operational limitations on this portion of the network, or what alternative dispatching decisions Norfolk Southern supposedly rejected that might have avoided the delays—let alone what effects those alternatives would have had on other traffic, including other Amtrak trains.  And—aside from the wholly conclusory assertion that they are "unlawful," *e.g.*, Compl. ¶ 41—the complaint says nothing about Norfolk Southern's dispatching policies or procedures governing these situations.  To call these allegations "[t]hreadbare" would be an understatement. *See Iqbal*, 556 U.S. at 678.

For these unexplained examples to support a claim for relief under § 24308(c), "preference" would have to mean—so the Government must believe—that a freight railroad must resolve *every* individual dispatching decision in favor of an Amtrak train over any nearby freight trains, regardless of the consequences for other rail traffic.  On any other view of the law, these examples have obvious alternative explanations consistent with "preference."  For example, given the complaint's allegations, it is wholly plausible that Norfolk Southern directed each Amtrak train into a siding because putting the freight train into the siding would actually have taken longer, or because this was the most efficient way to clear the line for *all* nearby traffic, including other passenger trains.  *See infra* § III.B.2 (discussing authorities approving of this practice).  Only if such rationales were impermissible could the complaint's factual allegations suggest a violation of § 24308(c).

The Government thus appears to have adopted the view Amtrak has recently asserted:  That "preference" creates an "[in]flexible" requirement that, "in making individual dispatching decisions at any rail line, junction, or crossing, a host carrier must ensure that Amtrak has preference over freight transportation."  Amtrak's Opening Statement 64, *Compl. & Pet. of the Nat'l R.R. Passenger Corp. under 49 U.S.C. § 24308(f)*, S.T.B. Docket No. NOR 42175 (filed Oct. 8, 2024), *available at* https://shorturl.at/1V5Zu.

The complaint also alleges that Norfolk Southern violates "preference" by "operat[ing] freight trains on the Crescent Route that exceed the length of any siding" along the route; since such trains physically cannot pull off the main line into a siding, Amtrak trains must sometimes follow behind them.  *See* Compl. ¶ 35.  Since these kinds of delays can be avoided only by running shorter freight trains or building longer sidings, the complaint thus assumes that § 24308(c)'s "preference" obligation can dictate operational matters beyond the basic dispatching questions of

which train moves where and when. Indeed, on the Government's view, § 24308(c) silently limits the length of freight trains on Amtrak routes. *See id.*; Amtrak's Opening Statement 35–36.

Unless § 24308(c) imposes such broad and unqualified obligations, the complaint fails to state a claim. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (cleaned up). That is true "[p]articularly where the defendant's allegedly unlawful conduct has an obvious alternative explanation." *Bryant v. Taylor*, 244 F. Supp. 3d 209, 212 (D.D.C. 2017) (cleaned up). By not even trying to negate reasonable, commonplace explanations for the specific delays alleged, the complaint necessarily assumes that such explanations are legally irrelevant.

For that matter, the complaint's examples are just that—examples. The complaint does not purport to challenge a few discrete instances of "preference" violations; it seeks to allege an ongoing pattern of violations, premised on the overarching legal theory that (emergencies aside) "freight train interference delays result from preference violations." *See* Compl. ¶¶ 2, 28, 31. Norfolk Southern's Rule 12(b)(6) motion thus boils down to this: Does § 24308(c) impose an absolute, unyielding duty to give each Amtrak train priority in every situation, regardless of the context and consequences? As explained next, the answer is no.

**B.    The Government's extreme theory is wrong.**

Every interpretive tool—statutory text, structure, context, history, and practical consequences—shows the Government's position cannot be right. Far from imposing an inflexible duty to clear the rails for every Amtrak train, consequences be damned, Congress required freight railroads to give Amtrak trains priority while *also* ensuring that freight shippers receive adequate service and the rail network remains fluid for all traffic. The Government's contrary view would have disastrous consequences.

1.     **Statutory text, structure, and context show that Congress did not mandate absolute priority for Amtrak trains.**

Statutory interpretation "begin[s] with the text," which "must be read in the context of the entire statute." *Noble v. Nat'l Ass'n of Letter Carriers*, 103 F.4th 45, 50 (D.C. Cir. 2024) (cleaned up); *Yates v. United States*, 574 U.S. 528, 537 (2015) (plurality).  At each level—the preference provision, the rest of § 24308, and the whole statutory regime—the statutory analysis forecloses the Government's view.

***The preference provision***.  The statutory "preference" provision, § 24308(c), does two things.  First, it imposes the preference obligation:  "Except in an emergency, [Amtrak passenger service] has preference over freight transportation in using a rail line, junction, or crossing unless the [Surface Transportation] Board orders otherwise under this subsection." 49 U.S.C. § 24308(c). Second, it limits this obligation by requiring the Board to grant relief if compliance would materially impair freight service:  "If the Board . . . decides that [providing] preference . . . materially will lessen the quality of freight transportation provided to shippers, the Board shall establish the rights of the carrier and Amtrak on reasonable terms." *Id.*

Both aspects of this language cut against the Government's view.  First, the ordinary meaning of "preference" is "[a]n advantage given to one over others" or "a practical advantage given to one over others."   *The American Heritage Dictionary* 556 (1970); *The Random House Dictionary* 1134 (1973); *see also Scholastic Dictionary of American English* (1971) (defining preference as "liking or favoring of one thing over another").  Thus, subsection (c)'s plain language requires host railroads to dispatch Amtrak trains more advantageously than freight traffic when they are "using" a particular "rail line, junction, or crossing."  49 U.S.C. § 24308(c).

An "advantage" is not necessarily dispositive.  A job candidate who has the advantage of knowing someone at the company or a letter from an influential recommender may not get the job

when all factors are taken into account.  And Congress did not use a stricter term like "priority."

Nor did Congress include language like "to the greatest extent feasible," which it has used in other

"preference" statutes to mandate "maximum" efforts or "every affirmative action" possible.  *See*

*Alaska Chapter, Associated Gen. Contractors of Am., Inc. v. Pierce*, 694 F.2d 1162, 1166 (9th Cir.

1982) (discussing a statutory "preference in the award of" contracts for Indian-owned businesses).

Preference thus puts a heavy thumb on the scale in Amtrak's favor, but other factors may outweigh

that advantage when a specific dispatching decision is made.

Second, the text makes clear that Congress did not intend the preference obligation to

"materially . . . lessen the quality of freight transportation provided to shippers."  49 U.S.C.

§ 24308(c).  If a freight railroad makes this showing, the Board *must* grant relief.  Practically, then,

this language imposes an outer bound for what "preference" can mean, lest the exception swallow

the rule.  *See infra* p. 29.

**The rest of § 24308.**  The "specific context in which [the] language is used," *Yates*, 574

U.S. at 537 (plurality), likewise cuts against the Government's absolutist position by mandating a

contractual relationship in which Amtrak negotiates service levels with host carriers.

As noted, the preference provision was not originally part of the statute; it was adopted

three years later.  *See supra* p. 4.  The statute's centerpiece has always been subsection (a), which

authorizes Amtrak and host railroads to contract for Amtrak's use of railroad facilities:  "Amtrak

may make an agreement with a rail carrier or regional transportation authority to use facilities of,

and have services provided by, the carrier or authority under terms on which the parties agree."

49 U.S.C. § 24308(a)(1).  These contractual terms "shall include a penalty for untimely

performance."  *Id.* § 24308(a)(1).  If the parties cannot agree, the Board can "prescribe reasonable

terms and compensation."  *Id.* § 24308(a)(2)(A)(ii).  And compensation, if set by the Board, must

at least cover "the incremental costs of [Amtrak] using the facilities and [the host] providing the services"; if compensation may exceed that figure, "quality of service" must be "a major factor" in setting the amount. *Id.* § 24308(a)(2)(B).

The statute thus contemplates a fundamentally contractual relationship between Amtrak and host railroads. After all, it was by "offer[ing] a contract to each railroad" that Amtrak first "assum[ed]" their obligation of providing "passenger service." H.R. Rep. No. 91-1580 (1970), 1970 U.S.C.C.A.N. 4735, 4740. And Congress adopted the "preference" provision against the backdrop of—and without altering—these adjacent statutory terms.

In turn, understanding how "preference" applies here requires understanding the contractual "terms" that already govern Amtrak's relationship with Norfolk Southern, by Amtrak's voluntary agreement. 49 U.S.C. § 24308(a)(1). For example, whether subsection (c) requires Norfolk Southern to avoid *any* "freight train interference," *see* Compl. ¶ 32, must depend at least in part on whether the parties' contract under subsection (a) specifically allows Norfolk Southern to weigh the needs of freight service in making dispatching decisions.

In fact, the contract does exactly that. Although the complaint does not attach or describe the contract, the Court can consider it because the complaint specifically mentions Amtrak's "operating agreement[] with Norfolk Southern," *see* Compl. ¶ 12, and the statutory structure makes the contract "integral" to the Government's claims. *E.g.*, *Scott v. J.P. Morgan Chase & Co.*, 296 F. Supp. 3d 98, 105 (D.D.C. 2017) (considering various documents referenced in the complaint on a Rule 12 motion, including an "agreement between Defendant and the federal government to carry out" the program at issue). Multiple contract provisions are relevant here:

- **Section 3.1(a):** Norfolk Southern agrees to provide Amtrak with services and access to rail lines to support intercity passenger service, but "[t]he routes, schedules, and

[trains] of Amtrak Intercity Rail Passenger trains operated on the Rail Lines shall be *compatible with the physical capabilities of [Norfolk Southern] and its Rail Lines*" (emphasis added).

- **Section 3.2(a):**  Norfolk Southern agrees to provide Amtrak with "new, modified, additional, or reduced services" upon Amtrak's request, but the requested services "shall be subject to the physical and financial capabilities of [Norfolk Southern] and shall give due regard to [Norfolk Southern's] speed, weight and similar operating restrictions and rules and safety standards and *to the avoidance of unreasonable interference with the adequacy, safety and efficiency of [Norfolk Southern's] other railroad operations*" (emphasis added).

- **Section 3.3(b)**:  Norfolk Southern "shall provide services *hereunder in an economic and efficient manner* and shall *make reasonable efforts*" to, among other things, (1) "deliver each train to all scheduled stops on [Norfolk Southern] within its scheduled running time"; and (2) "*avoid delays to trains*, and, consistent with safety, to make up delays incurred" (emphasis added).

- **Appendix V:**  "Amtrak shall pay [Norfolk Southern] performance payments or assess [Norfolk Southern] performance penalties for operation of [specified] Amtrak trains . . . based upon the number of minutes of [Norfolk Southern] Delays that such trains incur."  In other words, the agreement contains an enforcement mechanism for poor host performance by Norfolk Southern and rewards Norfolk Southern for achieving a level of passenger service performance that exceeds a benchmark established by the parties.

*See* McClellan Decl. Ex. 1.

Together, the provisions of this contract, which Amtrak voluntarily signed under subsection (a) of the statute, bolster the conclusion that subsection (c) imposes a flexible obligation that accounts for network constraints and freight-service obligations rather than the absolute obligation the Government asserts. Otherwise, Amtrak would have no incentive to negotiate these contracts in the first place—and freight railroads would have no reason to sign them. By ignoring the contract's terms, the Government's legal theory conflicts with the statutory structure.[3]

***The broader statutory scheme.*** Three aspects of "the broader context of the statute as a whole," *Yates*, 574 U.S. at 537 (plurality), confirm that Congress did not require freight railroads to prioritize Amtrak traffic regardless of the cost to freight service or network fluidity.

First, the Interstate Commerce Act codifies the freight railroads' common-carrier obligation, requiring them to "provide [freight] transportation or service on reasonable request" from a customer. 49 U.S.C. § 11101(a). This "common carrier obligation . . . is of paramount importance"; indeed, providing freight service is the host railroads' reason for existing. *See Norfolk S. Ry.—Pet. for Decl. Ord.—Interchange with Reading Blue Mountain & N. R.R.*, Docket No. NOR 42078, 2003 WL 1963547, at *5 (S.T.B. served Apr. 29, 2003).

Second, the Interstate Commerce Act lays out the nation's rail-transportation policy, which includes minimal regulation; fostering a safe and efficient rail transportation system, "with effective competition among rail carriers and with other modes"; and ensuring "sound economic conditions" in the rail industry. *See* 49 U.S.C. § 10101.

Third, the Amtrak-access and "preference" statutes were part of a vast, decade-long effort to "rehabilitat[e] the rail system in order to meet the demands of interstate commerce and the

---

[3] If this case progresses, Norfolk Southern reserves the right to argue that Amtrak has waived its statutory "preference" rights to the extent they might otherwise exceed the level of service Amtrak voluntarily agreed to accept (and pay for) in its contract with Norfolk Southern.

national defense." *E.g.*, Staggers Rail Act of 1980, Pub. L. No. 96-448, § 3(1), 94 Stat. 1895, 1897 (1980).  By the 1960s, railroads faced fierce competition for both passenger and freight service, thanks to the ascendant aviation industry, the modern interstate highway network, and containerized ocean shipping.  *See* Assoc. of Am. R.R., *Chronology of America's Freight Railroads* (Aug. 2024), AAR.org/chronology.  Plummeting passenger ridership, combined with a rigid regulatory scheme, "endanger[ed] the present and future welfare of the railroad industry." *R.R. Passenger Train Deficit*, 306 I.C.C. 417, 479 (1959).  This crisis came to a head with the 1970 bankruptcy of the nation's largest railroad, Penn Central.

Congress responded to this cataclysm with the Rail Passenger Service Act, which sought "to prevent the complete abandonment of intercity rail passenger service and to preserve a minimum of such service along specific corridors."  H.R. Rep. No. 91-1580, at 1, 1970 U.S.C.C.A.N. at 4735.  As explained above, this law created Amtrak and established the contractual scheme now codified at § 24308(a).  And over the next decade, Congress went on to pass several other laws to foster competition and efficiency in the still-fragile rail industry.  *See Simmons v. ICC*, 697 F.2d 326, 328 (D.C. Cir. 1982) (describing this history).  A key goal of this overhaul was easing financial and regulatory burdens on the freight railroads so they could efficiently compete with other modes of transportation and attract private investment.  *See id.*; H.R. Rep. No. 104-311, at 90–91 (1995), 1995 U.S.C.C.A.N. 793, 803 (explaining how "Congress took a number of steps to salvage the industry," including undoing the existing "Kafkaesque regulatory regime").

An absolutist view of "preference" conflicts with all these other provisions.  The Government's view would undermine the freight railroads' ability to provide common-carrier freight service; it would impair their ability to compete with other modes of freight transportation;

and it would impose significant financial burdens and inefficiencies.  Indeed, the Government's position here is incompatible with an efficient rail network, period—as explained below, it would cause gridlock.  *See infra* § II.B.3.

And in this broader context, it is especially implausible that "preference" is so rigid that it implicitly limits the length of all freight trains on all Amtrak routes.  *See* Compl. ¶ 35; *supra* p. 16.  The Supreme Court long ago held that train-length limitations are so disruptive to "the free flow of interstate commerce" that the Constitution forbids individual states from enacting them.  *See S. Pac. v. State of Ariz. ex rel. Sullivan*, 325 U.S. 761, 770–74 (1945).  Given that "Congress does not hide elephants in mouseholes," *AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 78 (2021) (cleaned up), the Court should not assume that Congress imposed such a jarring limitation across the nation just by codifying the word "preference"—especially in the midst of a massive deregulatory effort aimed at shoring up the vulnerable rail industry.

<strong>2.    Regulatory and legislative history confirm that "preference" has never meant absolute priority for passenger trains.</strong>

The statutory history, both before and since enactment, further rebuts the Government's view.  Preference for passenger trains has never worked the way the complaint assumes, and the legislative record reflects that fact.

In the midst of the decade-long legislative effort just described, Congress codified the "preference" obligation in what is now § 24308(c).  Congress was not writing on a blank slate: Passenger trains had long been given preference over freight trains—including when one carrier provided both services—but not the absolute priority the Government seeks here.  As the Interstate Commerce Commission observed in 1967, addressing one of the specific scenarios alleged in the complaint:  "Operating conditions may dictate that passenger trains be sidetracked for long freight trains which will not fit the length of sidetracks . . . ."  *S. Pac. Co.—Discontinuance of Trains*, 330

24

I.C.C. 685, 693 (1967).  Likewise, as the agency explained three years later in rejecting complaints that Penn Central's "passenger trains [were] delayed to permit prompt movement of freight trains": "In the day-to-day operation of any railroad discretion must b[e] given to the dispatcher to assure safe movement of all trains and there are bound to be meets and passes requiring such actions." *Penn Cent. Transp.—Discontinuance of 34 Passenger Trains*, 338 I.C.C. 380, 464 (1970).

Testimony in the legislative record—including from Amtrak—makes the same point.  In the lead-up to the 1973 legislation codifying "preference," Amtrak's president testified before Congress that "to try to legislate that and say, 'You will always give preference to the passenger train, or never let a freight train interfere,' just is not a real-world approach." *Financial Assistance to Amtrak*, 93d Cong. 32.  Rather, "[t]here are cases in railroad operations, a number of them, where freight train interference might be justified." *Id.*  And he, too, discussed the example of passenger trains being put into sidings so longer freight trains can pass:  "[I]n an area where you had a siding that would take five cars, which would be enough to accommodate that particular passenger train, but would not accommodate a 100-car freight train, it would be sensible to put the passenger train aside and get the freight train out of the way, not only for that segment, but for all of the operations that that train might later interfere with." *Id.*  This was the understanding before Congress when it codified the "preference" obligation.

Subsequent history confirms the point.  In the 52 years since Congress adopted this provision, no freight railroad has ever given Amtrak trains presidential-motorcade treatment.  For example, a different Amtrak president testified before Congress in 1976:  "We can actually get faster passenger trains in some cases, depending upon the situation, by putting a passenger train, which is short, into the siding and getting that freight past it on the main line, particularly when the freight train won't fit in the siding. This is just prudent operation." *Dep't of Transp. and*

*Related Agencies Appropriations for Fiscal Year 1977: Hearings Before Subcomm. of the S. Comm. on Appropriations*, 94th Cong. 547 (1976) (testimony of Amtrak president P. Reistrup). Likewise, at a 2004 Surface Transportation Board hearing, Amtrak's head of freight railroad relations was asked: "Do Amtrak trains have priority on the track when they come through on a scheduled basis? . . . Do the other trains have to get off the track and let you through . . . ?" Hr'g Tr. 68:4–20, *Buckingham Branch R.R.—Lease—CSX Transp., Inc.*, S.T.B. Docket No. FD 34495 (Oct. 13, 2004). His answer was no:

> Well, there is a Federal statute, The Rail Passenger Service Act, which calls for Amtrak trains to have priority. There is also in the real world in terms of trying to get two trains across a single-track railroad, it is sometimes more efficient for an Amtrak train to wait for a freight to come through. *We are not always given priority either on this line or on any line in the country.*

*Id.* (emphasis added). In other words, all parties have long recognized that a "passenger train operation shall be [effectuated] without undue interference with the freight operation." *Dep't of Transp. and Related Agencies Appropriations for 1982: Hearings before a Subcomm. of the H. Comm. of Appropriations*, 97th Cong. 483 (1981) (testimony of Amtrak president A. Boyd).

Similarly, in 2015, the Surface Transportation Board proposed a policy statement recognizing that "a host rail carrier need not resolve every individual dispatching decision between freight and passenger movements in favor of the passenger train." *Proposed Policy Statement*, S.T.B. Docket No. EP 728, slip. op. at 3, https://shorturl.at/nfqZr. Rather, as experience in the 1990s demonstrated, "congestion at one location can adversely affect the rail network at large," so "a dispatching decision that may appear, in isolation, to favor freight over passenger efficiency may ultimately promote efficiency and on-time service for passenger trains on the network generally (including, for the long run, trains on the particular route at issue)." *Id.* at 4. While Amtrak disputed the Board's proposed legal interpretation (and the policy statement was

ultimately withdrawn), Amtrak nowhere claimed that it had ever received the absolute priority it was supposedly entitled to—a striking omission given that 40 years had already passed since the statute's enactment. *See generally Comments of the Nat'l R.R. Passenger Corp.*, S.T.B. Docket No. EP 728 (filed Feb. 22, 2016), https://shorturl.at/LIgg1.

Although host railroads have never given Amtrak the absolute priority the Government seeks, the Department of Justice has sued a host under § 24308(c) just once, in 1979; as noted, that case was resolved without a final decision. *Supra* p. 4. And as the complaint notes, "[n]o host railroad has ever sought, let alone been granted . . . relief from [the Board]" from the "preference" obligation. Compl. ¶ 13. So either every host railroad has constantly violated § 24308(c) for half a century, with the Government doing nothing about it—or the statute does not mean what the Government belatedly claims.

### 3. The Government's theory would upend the rail network and Amtrak's finances.

Finally, the practical consequences of the Government's view confirm that it cannot be correct. The Government's position, if adopted, would grind the rail network to a halt and risk bankrupting Amtrak.

*First*, host railroads cannot give Amtrak trains absolute priority without causing gridlock. A 2008 Department of Transportation report explains this effect: "The rail network operates 24 hours a day, 7 days a week," so "[d]elays in one part of the network can set off another type of delay later on in the network, which creates a 'ripple' effect." Dep't of Transp., Office of Inspector Gen., *Root Causes of Amtrak Train Delays* 19, No. CR-2008-076 (Sept. 8, 2008), https://shorturl.at/YXwU6. "It can take up to 5 days, and sometimes up to 1 month, to restore service to normal operations after an unplanned disruption. Unlike the aviation system, which

allows planes to be repositioned overnight, there is no 'down time' within which trains can be repositioned." *Id.*

And these cascading delays can be caused by giving passenger trains absolute priority. The DOT report explained the freight railroads' concern—and Amtrak's concession—that "adhering strictly to Amtrak's definition of preference" would "shut down the rail network": "Amtrak agreed that, as a practical matter, *such strict adherence could cause rail traffic in certain areas of high traffic volume and chokepoints to shut down.* According to Amtrak, there will be certain circumstances in which the host railroads have no practical alternative than to violate what Amtrak views as its right to preference." *Id.* at 5 (emphasis added). The DOT report thus concluded: "In some instances, Amtrak's definition of preference could shut down the rail network." *Id.* (initial capitals omitted).[4]

The "preference" statute should not be construed to impose an obligation that even Amtrak admits is impossible to comply with.

*Second*, the added costs of prioritizing Amtrak trains—and the resulting delays—would fall on Amtrak itself. By statute, Amtrak must pay a host railroad at least "the incremental costs of [Amtrak] using [its] facilities and [the host] providing the services" for passenger traffic. 9 U.S.C. § 24308(a)(2)(B). Incremental costs are "those costs that the carrier incurs as a result of Amtrak's use of its facilities" above and beyond the freight carrier's baseline costs for those facilities without Amtrak's use. *Application of the Nat'l R.R. Passenger Corp. Under 49 U.S.C. 24308(a)—Union Pac. R.R. & S. Pac. Transp. Co.*, 3 S.T.B. 143 (1998). If Amtrak's "use of the freight carriers' facilities . . . could further strain [their network] capacity, require additional

_____

[4] Norfolk Southern does not agree with all of the DOT report's conclusions about the causes of these delays, but it aptly summarizes the network's operation and the stakeholders' positions.

infrastructure investment, and impose other substantial costs," freight railroads may recover those costs so long as they are directly traceable to Amtrak's services. *Id.*

Giving Amtrak trains absolute priority would significantly constrain Norfolk Southern's network capacity. Norfolk Southern would have to either (1) significantly reduce the number and length of freight trains operating on Amtrak routes or (2) risk gridlock from cascading delays to existing freight traffic. Either way, the resulting costs would be substantial, and by statute Norfolk Southern would be entitled to recover those costs from Amtrak. Amtrak may well be unable to afford these vast sums, which may in turn fall on the taxpayers.

It is no answer to these concerns that Norfolk Southern "may apply to the Board for relief" under the "preference" provision's "quality of freight transportation" safety valve. 49 U.S.C. § 24308(c). Precisely because absolute priority would severely degrade network capacity, the Government's interpretation would entitle *every* host railroad to relief for *every* Amtrak route. Again, safety-valve relief is mandatory if the railroad shows that providing preference "materially will lessen the quality of freight transportation provided to shippers." *Id.* Thus, on the Government's view, the safety valve's exception would swallow the rule, rendering the basic "preference" obligation a dead letter and replacing it with a case-by-case regime in which the Board must "establish the rights of [every] carrier and Amtrak" for each route "on reasonable terms." *Id.* The Government's position thus violates the rule that a statutory provision with an exception should be construed "to preserve the primary operation of the provision." *Maracich v. Spears*, 570 U.S. 48, 60 (2013).

*     *     *

In sum, Congress used statutory language that requires giving Amtrak trains an advantage, but not a trump card. And it adopted the "preference" statute against the backdrop of (i) a settled

29

industry practice that gave dispatchers flexibility to ensure network fluidity and (ii) a statutorily mandated set of contractual relationships in which Amtrak agreed to accept and pay for specific levels of service.  For five decades, host railroads have applied the same flexible approach under their contracts with Amtrak.  If the Government's inflexible view of "preference" were adopted, it would either wreak havoc on the rail network and Amtrak's finances or destroy the "preference" obligation altogether by entitling every host railroad to automatic relief under the safety-valve provision.  The Court should reject the Government's invitation to upend Congress's scheme in this way.

## CONCLUSION

The Court should dismiss this case or transfer it to the Northern District of Georgia under Rule 12(b)(2)–(3) and 28 U.S.C. §§ 1404(a), 1406(a), 1631.  Alternatively, the Court should dismiss the complaint for failure to state a claim under Rule 12(b)(6).

If the Court is inclined not to transfer the case, Norfolk Southern requests oral argument on its Rule 12(b)(6) motion.

January 27, 2025

Respectfully submitted,

*/s/ Kristin Graham Koehler*
Kristin Graham Koehler (D.C. Bar No. 464422)
Gordon D. Todd (D.C. Bar No. 475203)
Raymond A. Atkins (D.C. Bar No. 461476)
Tobias S. Loss-Eaton (D.C. Bar No. 1019749)
Stephen S. Laudone (D.C. Bar No. 1708325)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
kkoehler@sidley.com

*Counsel for Norfolk Southern Corporation*
*and Norfolk Southern Railway Company*